IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAURICE JOHNSON,
*Plaintiff*,

v.

MERCHANTS TERMINAL CORP.
*Defendant.*

Civil Action No. ELH-16-838

## MEMORANDUM OPINION

Maurice Johnson, the self-represented plaintiff, filed suit against "Merchants Terminal Corp.", alleging that he suffered discrimination based on race, in the form of harassment and wrongful termination, in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). ECF 1.[1] In his Complaint, Johnson claims that he was "terminated unjustly" (*id.* at 2) and that defendant "fabricated acts of gross misconduct to terminate" him. *Id.* at 3. He seeks, *inter alia*, punitive damages; injunctive relief; back pay; reinstatement to his former position; and costs. He also seeks attorneys' fees, although he is unrepresented. *Id.* at 3-4, 11.

Now pending is the motion for summary judgment (ECF 16) filed by MTC Logistics, Inc. ("MTC"), which defendant asserts is its correct corporate name. *Id.* at 1. The motion is supported by a memorandum of law (ECF 16-1) (collectively, "Motion") and several exhibits. ECF 16-2 through ECF 16-10. Johnson responded in opposition. ECF 18 ("Opposition"). He has also appended exhibits with his Opposition. ECF 18-1 through ECF 18-8. MTC has replied (ECF 22, "Reply"), with exhibits. ECF 22-1 through ECF 22-3. The Court received a letter

---

[1] Defendants Jeff Carden and Ken Johnson were also sued. They moved to dismiss the Complaint for failure to state a claim against them under Title VII. ECF 6. I granted their motion by Memorandum (ECF 11) and Order (ECF 12) of June 16, 2016.

from Mr. Johnson on December 21, 2016, which appears to constitute a second response in opposition to the Motion. ECF 24. I shall construe ECF 24 as a supplement to the Opposition ("Supplement").[2]

The Motion is fully briefed and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.[3]

## I.     Factual and Procedural Background

MTC operates a cold storage warehouse in Jessup, Maryland, used primarily to store refrigerated and frozen food. ECF 16-2 (Johnson Deposition) at 2. In general, suppliers bring frozen and refrigerated food products to MTC for storage, from which the food products are picked up and transported to points of distribution. *Id.* at 3. Jeffrey Carden has been the plant manager of MTC since at least 2007. *Id.* at 5; *see* ECF 16-3 (Carden Affidavit).

Johnson worked for MTC Logistics, Inc. or its predecessor, Merchant's Terminal Corporation, during three periods. Johnson was first hired by Merchant's Terminal Corporation in April 2007. ECF 16-2 at 5. He was terminated in October 2007 for leaving work without authorization. *Id.* at 5-6. Johnson testified at his deposition that on the day that he was terminated in 2007, he had been scheduled for overtime, but informed Carden and his supervisor that he was sick and could not work late. *Id.* at 5. Johnson testified that Carden told him "if you leave, you are fired", after which he was terminated. *Id.* at 5-6.

---

[2] Plaintiff has moved to strike the Supplement as an unauthorized surreply. ECF 25; *see* Local Rule 105.2(a). Given that the Supplement appears to be a more complete response to the Motion, rather than a surreply, and because plaintiff is self-represented, I shall deny the motion to strike.

[3] The Court is mindful of its obligation to construe liberally the pleadings of a pro se litigant, which are "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94; *see also White v. White*, 886 F.2d 721, 722-23 (4th Cir. 1989).

In January or February of 2010, Johnson called Carden "about five times" about getting rehired. *Id.* at 6. He was rehired on April 20, 2010. *Id.* Johnson was then terminated for a second time on September 15, 2010, for "alleged theft." *Id.* Following the intervention of Johnson's union, Teamsters Local 570, Johnson was allowed to return to work after about 30 days. *Id.* at 6-7.[4]

Johnson received several written warnings in 2013 and early 2014 from MTC's management. On January 20, 2013, Carden and Garry Kvech, MTC's Assistant Plant Manager (ECF 16-7, Kvech Affidavit), sent Johnson a letter confirming that Johnson was "given a verbal warning for [his] poor attendance/lateness record." ECF 16-8 at 1. Carden and Kvech wrote a letter to Johnson on February 19, 2013, stating: "During the past 30 work days, your attendance record has been unacceptable." *Id.* at 2. The letter warned: "Further attendance problems will necessitate more severe disciplinary action." *Id.*

Carden wrote to Johnson on October 8, 2013, confirming that Johnson "was given a verbal warning for [his] poor attendance/lateness record." *Id.* at 3. And, on November 4, 2013, Carden wrote again to Johnson, indicating: "During the past 30 work days, your attendance record has been unacceptable." *Id.* at 4. That letter concluded: "Further attendance problems will necessitate more severe disciplinary action." *Id.*

Carden and Kvech also wrote to Johnson on January 7, 2014, warning him that he would be suspended if his attendance and timeliness issues continued. *Id.* at 5. The letter of January 7, 2014 provided: "You have received both verbal and written warnings regarding your attendance.

---

[4] At his deposition, Johnson alluded to a termination in April 2011 following an arrest. ECF 16-2 at 7. But, the excerpt of the deposition provided by defendant does not include the full discussion of the April 2011 termination. *See id.* at 7-8.

Your frequent absences, tardiness, and or our [sic] failure to give your supervisor advance notice thereof creates a burden for you [sic] Company and your co-workers." *Id.* It also stated, *id.*:

> Please be advised that you will be suspended for three (3) days if:
>
> 1. You are absent or late more once [sic] in the next sixty work days, unless you are hospitalized or absent for another reason acceptable to the Company or,
> 2. You do not notify your supervisor as soon as possible after learning that you will be absent or late.

Then, by letter of February 26, 2014, Carden suspended Johnson for three days. *Id.* at 6 ("Suspension Letter"). The Suspension Letter provided, *id.*:

> You have received verbal and written warnings regarding your attendance. Subsequently, you have had 2 occurrences since your 2nd written warning was given to you on 1/7/2014. Be advised that you will be suspended for (3) three days for your poor attendance. Your suspension dates will be Tuesday 3/4/2014 thru [sic] Thursday 3/6/2014. Your return date is Friday 3/7/2014 at your regularly scheduled time.

Moreover, the Suspension Letter warned, *id.*:

> Based on you [sic] record, it appears that you do not care about your job. Accordingly, please be advised that you will be discharged if:
>
> 1. You are absent or late more then [sic] once in the next sixty (60) work days, unless you are hospitalized or absent for another reason acceptable to the Company or,
> 2. You do not notify your supervisor as soon as possible after learning that you will be absent or late.

Johnson served his suspension from March 4, 2014 through March 6, 2014. ECF 16-2 at 26. But, Johnson testified that he had to come to work on March 5, 2014. *Id.* Ultimately, Johnson was terminated on March 12, 2014. *Id.* at 4; *see* ECF 16-3, ¶ 9. The events that culminated in his termination are recounted below.

In March 2014, Johnson was working as a forklift operator at MTC's "loading dock four." *Id.* at 3, 14. His duties were "to pick orders or retrieve product from racks or put product

in racks . . . ." *Id.* at 3. Picking orders consists of retrieving wood or rubber pallets with a forklift from the racks that are about fifteen or twenty feet tall, and bringing the pallets to the loading dock area. *Id.* Johnson testified that pallets weigh between seventy and two hundred pounds and that the forklifts are big enough to lift the pallets some fifteen to twenty feet. *Id.*

The MTC facility has a room called the "truckers' lounge." It has tables, vending machines, and a bathroom for truckers to use while they wait for their trucks to be loaded or unloaded. *Id.* at 15-16. There are two doors to the truckers' lounge. One is to the "breezeway", an area where forklifts and pallet jacks move goods between the facility's storage rooms. ECF 16-3, ¶ 3. The other is to a receiving area, where truckers usually enter the building and submit documents. ECF 16-2 at 15. The door to the truckers' lounge from the breezeway can only be opened from the breezeway (*i.e.*, persons inside the truckers' lounge cannot gain access to the breezeway unless someone opens the door from the other side). *Id.* at 15-16.

Johnson testified that he was aware that MTC had a policy barring employees from using the truckers' lounge. *Id.* at 17. At his deposition, Johnson claimed: "All employees use the trucker's [sic] lounge." *Id.* Yet, he also said: "Everybody knows not to use the truckers' lounge." *Id.* Rather, MTC employees were to use the employee locker room or the sitting room, which are located in a different part of the building. *Id.* at 12.[5]

At 11:00 a.m. on March 11, 2014, Johnson and other workers went on a ten minute break. *Id.* at 11. Johnson left his work area and entered the truckers' lounge. *Id.* at 18. Once in the truckers' lounge, Johnson put his head down on a table, where he stayed for approximately thirty minutes, *i.e.*, twenty minutes beyond the end of his break. *Id.* at 19. When Johnson was ready to

---

[5] In his Opposition (ECF 18 at 1) Johnson claims no other employee was terminated for use of the truckers' lounge.

return to work, he had to knock on the window of the door to the breezeway and wait for someone to open it. *Id.*

While Johnson was in the truckers' lounge, Kvech observed him through the window of the breezeway door. ECF 16-7. In his affidavit, Kvech stated, *id.* ¶ 3: "I saw Maurice Johnson sitting on a chair next to a table that was between the vending machines and the bathroom in the trucker's [sic] lounge. Mr. Johnson was not moving and appeared to be sleeping." Kvech then reported his observation to Carden. *Id.* ¶ 4; *see* ECF 16-3, ¶ 5. Carden reviewed video footage of the truckers' lounge around the time Kvech said he saw Johnson in the lounge. ECF 16-3, ¶ 6. Based on his review, Carden "assumed [Johnson] was sleeping because he did not move from his position during the approximately 30 minutes he was in the lounge." *Id.*

After Johnson left the truckers' lounge, another employee, Kevin Harrington, informed Johnson that Carden wanted to see him. ECF 16-2 at 21. Johnson went to Carden's office, where Carden questioned him about why he was sleeping in the truckers' lounge. *Id.* at 21-22. Johnson testified that he told Carden that he "had a cold in [his] chest and back, [his] clothes were wet, [and he] felt . . . queasy." *Id.* Johnson also told Carden that he had taken oxycodone the night before. *Id.* at 22.

By letter of March 12, 2014, Carden terminated Johnson. ECF 16-9. The letter stated (brackets in original):

> On March 11, 2014, you were away from your work area for more than 20 minutes before you returned to work. I believe that you went into the truckers' lounge (where our employees are not permitted to be) in order to hide and sleep. When you were confronted about this, you said you were not asleep, you were "incoherent". When I asked you what you meant by "incoherent", you said you had taken Oxycontin for being cold. You said you forgot your mask and regular gloves and you knew you were going to be cold, so you took a couple of Oxycontin because you knew that once you got cold and wet you would have pain.

Your conduct shows a gross disregard for your job [and the safety of your coworkers]. Accordingly, you are discharged.

At his deposition, Johnson testified that he had decided to enter the truckers' lounge because he wanted "to get warm fast." ECF 16-2 at 20. When asked why he stayed past the end of his ten minute break, Johnson testified that employees have "a little leniency with the breaks" and that he "decided to sit there a few more minutes, to get [his] head together, because . . . [his] head was still spinning and [his] stomach felt bad." *Id.* Johnson speculated that his symptoms may have been side effects of oxycodone, which he had taken the night before. *Id.* at 11, 20.

Johnson was prescribed thirty oxycodone pills by his doctor on December 12, 2013. *Id.* at 22; *see* ECF 16-6 (prescription for oxycodone). The instruction from Johnson's doctor was to "take 1 tablet by mouth 3 times a day as needed." ECF 16-2 at 22; *see* ECF 16-6. Johnson took only two or three tablets in December, and "did have some left" in March 2014. ECF 16-2 at 22.

Johnson testified that he did not "really look at the bottle" when he received the oxycodone. *Id.* Notably, he testified that he knew that oxycodone is "strong medication." *Id.* at 23. Johnson also testified that he was aware of the side effects of oxycodone. The following exchange at Johnson's deposition is relevant, *id.*:

Q. Were you aware that Oxycodone can cause dizziness and sleepiness?
A. My doctor informed me of that.
Q. When did your doctor inform you of that?
A. When he prescribed it to me.
Q. So sometime in December of 2013?
A. Exactly.

Moreover, Johnson testified that he realized that using Oxycodone while operating a forklift could be dangerous, *id.* at 24:

Q. Now, do you realize that a possible side effect of taking Oxycodone is dizziness?

A.  Well, I've read that.

Q.  And that's actually on the prescription itself.

A.  Uh-huh.

*      *      *

Q.  Would you agree with me that taking a drug that could make you dizzy could be dangerous if you're using a forklift?

A.  I have [come] to realize that.

Q.  When did you come to realize that?

A.  From reading the side effects and what you're not supposed to do.

Q.  Where did you read about the side effects and what you're not supposed to do?

A.  On some paperwork that I retrieved from my physician.

Q.  When did you retrieve that paperwork from your physician?

A.  December of 2013.

Q.  When do you recall reading that paperwork?

A.  After I was terminated.

At the time of Johnson's termination, 70% of the warehouse workforce was African-American.  ECF 16-2 at 8; ECF 16-3 ¶ 10.  Following Johnson's termination, the next six employees hired by MTC as forklift drivers were African-American.  ECF 16-2 at 8; ECF 16-3, ¶ 10.  Johnson has acknowledged the hiring of six African-American forklift drivers after his termination, stating:  "I'm pretty sure it's true."  ECF 16-2 at 8.  In addition, in his Supplement, Johnson said:  "I was replaced by Wayne Hampton who is black."  ECF 24 at 5.

After Johnson was terminated, he filed a grievance with his union, Teamsters Local 570.  ECF 16-2 at 8-9.  However, by letter of May 23, 2014, the Executive Board of Teamsters Local 570 declined to pursue the matter.  ECF 16-10.  The letter to Johnson stated, *id.*:  "This letter is to advise you after a full review of the facts as presented at the Special Executive Board meeting that was held on May 13, 2014, the Executive Board will not proceed any further with your grievance."  *See also* ECF 16-2 at 9.

On January 28, 2015, Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* ECF 22-3 ("Charge"); ECF 16-2 at 9. The Charge alleges discrimination on the basis of race and provides that the "date(s) discrimination took place" were between March 6, 2014 and March 12, 2014. *See* ECF 22-3. In the Charge Johnson stated: "I believe I have been subjected to discrimination in the form of discipline, suspension and discharge based on my race, Black." *Id.* He concluded: "I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, regarding discipline, suspension and discharge based on my race (Black)." *Id.*

The EEOC sent Johnson a "right to sue letter" dated December 18, 2015. ECF 1-2 ("Right to Sue Letter"). Johnson received it on December 23, 2015. ECF 1, ¶10. In the Right to Sue Letter, the EEOC determined, ECF 1-2: "Having considered all the information provided by both you and Respondent, the Commission is unable to conclude that the information obtained establishes a violation of the statute as you've alleged." Johnson was advised of his right to file suit within 90 days of his receipt of the "Dismissal and Notice of Rights." *Id.*

## II.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of

summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied,* 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, ___ F.3d ___, 2017 WL 922014, at *2 (4th Cir. Mar. 8, 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d

208, 216 (4th Cir 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations.  *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact.  *Anderson*, 477 U.S. at 247–48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016).  Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 252.  And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]."  *Id.*

### III.    Title VII

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, "prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin, or retaliating against their employees for opposing or seeking relief from such discrimination."  *Green v. Brennan*, ___ U.S. ___, 136 S. Ct. 1769, 1773–74 (2016); *see Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 233 (4th Cir. 2016); *Boyer-Liberto v.*

*Fontainbleu Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

## A. Exhaustion

A plaintiff alleging discrimination under Title VII must file a charge with the EEOC before filing suit in a federal court. 42 U.S.C. § 2000e-5(f)(1) (2006) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter); *see also*, *e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000). This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles*, 429 F.3d at 491; *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 670 (4th Cir. 2015) (recognizing that "a primary objective" of the exhaustion requirement is to put parties on notice of allegations against them).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).[6] "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012).

---

[6] For a description of the full process, *see Balas*, 711 F.3d at 407.

To determine whether a plaintiff has "properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look *only* to the charge filed with that agency." *Balas*, 711 F.3d at 408 (emphasis added). Notably, even when, as here, a plaintiff has filed a claim with the EEOC, a court cannot consider matters that were not properly raised during the EEOC process. In *Jones v. Calvert Grp.*, 551 F.3d 297, 300 (4th Cir. 2009), the Court said: "'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" (quoting *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)); *see also Abdus-Shahid v. Mayor & City Council of Baltimore*, ___ Fed. Appx. ___, 2017 WL 35725, at *7 (4th Cir. Jan. 4, 2017); *Sydnor*, 681 F.3d at 595. As the Court said in *Evans*, 80 F.3d at 962-63, "The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."; *see also Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation.").

Although courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality," courts are "not at liberty to read into administrative charges allegations they do not contain." *Balas*, 711 F.3d at 408 (citations and quotation marks omitted). Rather, courts are constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'" *Balas*, 711 F.3d at 407-08 (citations omitted). In *Sydnor*, 681 F.3d at 594, the Fourth Circuit said: "[A]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable

administrative investigation, she may advance such claims in her subsequent civil suit." *Accord Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 669 (4th Cir. 2015).

### B. Adverse Employment Action

In order to prevail under Title VII, "the existence of some adverse employment action is required." *James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice where they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle,* 650 F.3d at 333–34.

Plaintiff was terminated from MTC. The termination constitutes an adverse employment action. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).

### C. Proof of Discrimination

In general, there are "two avenues" *at trial* by which a plaintiff may prove intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt.*, *Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) *as abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar*, ____ U.S. ____, 133 S. Ct. 2517 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116

(1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the three steps of the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In a termination case, the Fourth Circuit has said that, to establish a prima facie case of discrimination under Title VII, a plaintiff must show: "(1) she is a member of a protected class;

(2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds v. Leavitt,* 629 F.3d 369, 386 (4th Cir. 2012) (internal quotations omitted); *accord High v. R & R Transportation, Inc.*, ___ F. Supp. 3d ___, 2017 WL 1102854 (M.D.N.C. Mar. 16, 2017).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, ___ Fed. App'x ___, 2017 WL 908208, at *3 (4th Cir. Mar. 7, 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original)).

Conversely, if the defendant does not submit evidence of any legitimate basis for its actions, the fact-finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the summary judgment or motion to dismiss stage, however, these approaches merely serve to inform a court's evaluation of the allegations. *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 Fed. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas . . . .*").

## IV.  Discussion

### A. Harassment

In his Complaint, plaintiff alleges that he has been "harassed, threatened, suspended, and terminated," in violation of Title VII of the Civil Rights Act of 1964. *E.g.*, ECF 1 at 2. And, in his Opposition (ECF 18 at 1), Johnson lists ten examples of harassment

In its Reply, MTC argues that, to the extent that Johnson alleges violations of Title VII based on harassment, the Court must grant summary judgment as to that claim, because the contention goes beyond the scope of Johnson's EEOC Charge. ECF 22 at 14-15. MTC notes that in the Charge, Johnson stated that the earliest date of discrimination was March 6, 2014, and the latest date was March 12, 2014. ECF 22 at 14; *see* ECF 22-3. And, MTC observes that the Charge "contains no allegation that Mr. Johnson was ever harassed, or that he was subject to acts of discrimination prior to March 4, 2014." ECF 22 at 15; *see* ECF 22-3.

In my view, summary judgment is appropriate as to Johnson's claims for harassment, because Johnson failed to exhaust his administrative remedies as to that claim. As indicated, to bring a claim under Title VII, a plaintiff must exhaust the administrative process through the EEOC. *See, e.g.*, *Miles*, 429 F.3d at 491. But, even when a plaintiff has filed a claim with the EEOC and received a right to sue letter, courts cannot consider matters that were not properly raised within the four corners of the EEOC charge. *See Balas*, *supra*, 711 F.3d at 407-08.

For the reasons articulated by MTC, summary judgment is appropriate as to the claim of harassment, because Johnson did not raise that claim with the EEOC. Nor did Johnson articulate any of the claims of harassment that he advances in his Opposition. *See* ECF 18 at 1; ECF 22-3. Notably, as MTC indicates, Johnson stated in the Charge that the earliest date of discrimination was March 6, 2014, and the latest date of discrimination was March 12, 2014. *See id.*

**B. Termination**

In the Motion, MTC argues that summary judgment is appropriate because, as to his termination, Johnson has not put forth any direct or circumstantial evidence of discrimination on the basis of race, nor has he established a prima facie case of discrimination under the *McDonnell Douglas* framework. ECF 16-1 at 8-11; *see McDonnell Douglas*, 411 U.S. at 802.

I agree with MTC that Johnson has failed to produce either direct or circumstantial evidence that his race was a motivating factor in MTC's decision to terminate his employment. *See Holland*, 487 F.3d at 213. Nor has he established a prima facie case of discrimination.

"Direct evidence must be 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citation omitted). Circumstantial evidence, defined as "[e]vidence based on inference and not on personal knowledge or observation" (Blacks L. Dictionary, "Evidence" (10th Ed. 2014), "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508 (1957)); *see also The Robert Edwards*, 6 Wheat. (19 U.S.) 187, 190 (1821) ("Although [positive proof] may generally be desirable, we are not to shut our eyes on circumstances which sometimes carry with them a conviction which the most positive testimony will sometimes fail to produce."). For example, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 134, (2000).

To be sure, Johnson has alleged that Carden acted with discriminatory intent. *See, e.g.*, ECF 24 at 2. But, he has not produced any direct or circumstantial evidence of conduct by

Carden or any other person associated with MTC suggesting a discriminatory attitude on the part of MTC. "'A plaintiff's own conclusory assertions of discrimination in and of themselves are insufficient . . . to prove discriminatory animus and counter substantial evidence of legitimate, nondiscriminatory reasons for an adverse employment action.'" *Hare v. Comcast Cable Commc'ns Mgmt., LLC*, GLR-12-1830, 2013 WL 12069000, at *3 (D. Md. July 1, 2013) (quoting *Chyu v. Md. Dep't of Health & Mental Hygiene*, 198 F. Supp. 2d 678, 684 (D. Md. 2002)) (alterations in *Hare*), *aff'd*, 564 Fed. App'x 23 (4th Cir. 2014).

MTC also argues that summary judgment is appropriate because Johnson failed to set forth a prima facie case that he was terminated based on unlawful race discrimination. ECF 16-1 at 9-11. As indicated, to establish a prima facie case that a termination violated Title VII, the plaintiff must prove: "(1) [he] is a member of a protected class; (2) [he] suffered adverse employment action; (3) [he] was performing [his] job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds*, 629 F.3d at 386.

Clearly, Johnson has satisfied the first two criteria. I turn to an analysis of the remaining factors under the *McDonnell Douglas* framework. *See Lightner v. Cty of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008); *see also Reeves*, 530 U.S. at 141 (applying the *McDonnell Douglas* framework as to an allegation of disparate treatment in the context of an ADEA claim).

**1.**

MTC argues that Johnson has not shown, and cannot prove, that the position remained open or was filled by a similarly qualified person outside of his protected class. ECF 16-1 at 9-10. MTC points out that Johnson is African-American and that it is undisputed that the next six

people who were hired by MTC for the former position of forklift driver are African-Americans. *Id.*; *see* ECF 16-3, ¶ 10. And, MTC notes that, at the relevant time, approximately 70% of the warehouse workforce was African-American. ECF 16-1 at 9; ECF 16-3, ¶ 10.

In his Opposition and in his Supplement, Johnson does not contest these facts. *See* ECF 18; ECF 24. To the contrary, at his deposition, when asked whether MTC hired six black persons after he was fired, Johnson responded: "I'm pretty sure it's true." ECF 16-2 at 8. In his Supplement, Johnson stated: "I was replaced by Wayne Hampton who is black." ECF 24 at 5. And, at his deposition, when Johnson was asked if the 70% statistic was accurate, Johnson responded: "Yes, sir." ECF 16-2 at 8.

*Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998), *cert. denied*, 526 U.S. 1099 (1999), provides guidance. There, a male plaintiff brought suit under Title VII alleging, *inter alia*, that he was terminated by his former employer, the City of Baltimore, as a part of a "'purge' of white males from the upper management levels of the City Comptroller's office . . . ." *Id.* at 900. The district court granted summary judgment in favor of the defendant as to Brown's sex discrimination claim because Brown was replaced by another male. *Id.* at 905. The Fourth Circuit affirmed, noting that it was undisputed that Brown was replaced by a male (*id.* at 906) and stating, *id.* at 905: "In order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class." Likewise, in the case *sub judice*, there is no dispute that Johnson was replaced by another African-American.

Moreover, the exceptions to the general requirement that a plaintiff be replaced by someone outside of his protected class are not applicable here. In *Brown*, the Fourth Circuit recognized that a plaintiff may not have to prove that he was replaced with someone outside of

his protected class: (1) in age discrimination cases, where "a plaintiff within the protected class is replaced by another, but significantly younger, person within the same class"; (2) where there has been "a significant lapse of time between the plaintiff's application and its eventual decision to hire another individual within the same protected class"; (3) or where "the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination toward the plaintiff." *Id.* at 905 (citations omitted). Here, plaintiff has presented no evidence that any of these exceptions are applicable.

In view of the foregoing, summary judgment is appropriate as to Johnson's claim of race discrimination in violation of Title VII based on his termination from MTC, because there is no dispute of material fact that Johnson was replaced by workers within his protected class. *See McDonnell Douglas*, 411 U.S. at 802. Accordingly, he has failed to set forth a prima facie claim of racial discrimination.

**2.**

Even assuming, *arguendo*, that Johnson was replaced by a person outside of his protected class, Johnson has not presented any evidence creating a genuine dispute of material fact that he was meeting MTC's legitimate job performance expectations. As discussed, *supra*, MTC has presented substantial evidence that Johnson repeatedly was absent, which led to a three-day suspension for absenteeism the week prior to his termination. *See, e.g.*, 16-2 at 26; 16-8 at 6. And, MTC has presented evidence that Johnson told Carden that, while operating a forklift, he may have been experiencing the side effects of Oxycodone, a prescription pain medication. ECF 16-2 at 20-22.

In his Opposition, Johnson asserts, without reference to any evidence: "Since working for Merchant [sic] Terminal in 2001 [sic] until 2014, no employee have [sic] been terminated for

being in the truckers [sic] lounge, returning late for [sic] break, or being on prescription medicine." ECF 18 at 1.  In his Supplement, Johnson claims that he "did use the wrong choice of words in [his] deposition when [he] said [his] head was spinning." ECF 24 at 6.  According to Johnson, the heat was responsible for his nausea.  *Id*.  Further, Johnson asserts that "Carden is using the document that [Johnson] has submitted . . . and is in fact turning and twisting the events around . . . ." *Id.* at 7.  And, Johnson argues that many of his absences were attributable to health problems, for which he contends he was eligible for leave under the Family and Medical Leave Act, *as amended*, 29 U.S.C. § 2601, *et seq*.  *Id.* at 7-8.  Finally, Johnson points to several other employees with various disciplinary problems, but who were not terminated.  ECF 18 at 4; ECF 24 at 9.

In *King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003), the Fourth Circuit addressed the review of evidence of an employer's legitimate performance expectations under the *McDonnell Douglas* framework.  In *King*, the district court had granted summary judgment to the employer because plaintiff's "proffer . . . did not contain evidence that [plaintiff's] job performance was satisfactory at the time of his discharge." *Id.* at 148.  The Fourth Circuit affirmed, because plaintiff failed to establish that he met his employer's legitimate performance expectations.  *Id.* at 149-50.  The Fourth Circuit said that plaintiff's "own testimony, of course, cannot establish a genuine issue as to whether King was meeting appellee's expectations." *Id.* at 149.  The Fourth Circuit cited *Evans*, 80 F.3d 954, for the proposition that "'[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'"  *Id.* at 960-61 (citation omitted).

Moreover, the *King* Court also determined that the testimony of plaintiff's co-workers that their work product was similar to plaintiff's was not persuasive because such evidence "is *no*

proof that [plaintiff's] performance met appellee's legitimate job performance expectations." *King*, 328 F.3d at 149 (emphasis in *King*). According to the *King* Court, such evidence, "taken as fully accurate, might simply reflect that their job performance too was lacking." *Id.* at 149 n.3. In the Court's view, the appropriate way for plaintiff to prove that he was meeting his employer's legitimate performance expectations was to "offer qualified expert opinion testimony as to (1) appellee's legitimate job performance expectations and (2) analysis and evaluation of [plaintiff's] performance in light of those expectations." *Id.* at 150.

In my view, even assuming that Johnson's bald assertions are properly considered on summary judgment (*but see* Fed. R. Civ. P. 56(c)(1)(a) and (b)), Johnson has failed to establish a genuine dispute of material fact as to whether plaintiff met MTC's legitimate performance expectations. That other employees engaged in misconduct while on the job, but were not terminated, is not evidence that Johnson met his employers' legitimate performance expectations. *Id.* Rather, as observed by the *King* Court, such evidence, even taken as true, may only be probative of the fact that other employees were also failing to meet MTC's expectations. In short, Johnson has offered no evidence (or even assertions) that tend to suggest that he met his MTC's legitimate performance expectations.

On the other hand, MTC has submitted substantial evidence that Johnson was not meeting its legitimate performance expectations. As indicated, MTC has shown a long record of disciplinary issues relating to absenteeism (*see* ECF 16-8; ECF 16-9); that Johnson was seen in the truckers' lounge on the date of his termination, which Johnson knew was off-limits to MTC employees (*see* ECF 16-7, ¶ 3; ECF 16-2 at 18); and Johnson was operating a forklift while he believed that he was experiencing side effects of oxycodone (*see* ECF 16-2 at 20-21, 22).

In particular, Johnson's statement to Carden regarding the side effects of his medication is highly probative of the fact that Johnson was fired because he did not meet MTC's legitimate expectations, given that Johnson's job required him to operate heavy machinery, and he was responsible for moving two-hundred pound pallets. *See* ECF 16-2 at 3. Johnson admitted that driving a forklift while under the influence of oxycodone could be dangerous. *Id.* at 24.

Moreover, at his deposition, Johnson was asked: "Did you tell Mr. Carden [on March 14, 2014] that you had used or taken Oxycodone the night before?" Johnson answered: "Yes, sir." ECF 16-2 at 22. Johnson testified that he "told [Carden] I felt queasy because I took medication last night and I hadn't had anything on [sic] my stomach." *Id.* Even if Johnson's symptoms were not the result of being under the influence of oxycodone, the critical question is the perception of the decision maker. *Evans*, 80 F.3d at 960-61. Here, based on Johnson's statements, Carden reasonably could conclude that Johnson created a dangerous situation in the workplace because he was operating a forklift while under the influence of oxycodone. ECF 16-3, ¶ 9.

In sum, Johnson has failed to create a genuine dispute of material fact that he was meeting MTC's legitimate performance expectations. Accordingly, MTC is entitled to summary judgment on this basis.

## V. Conclusion

Johnson has failed to demonstrate a genuine dispute of material fact as to his claim that he was terminated on the basis of his race, in violation of Title VII. Johnson has neither proffered direct nor circumstantial evidence of discrimination, nor has he satisfied the elements of a prima facie case under the *McDonnell Douglas* framework. Accordingly, I shall GRANT summary judgment in favor of MTC.

An Order follows, consistent with this Memorandum Opinion.


Date:   April 27, 2017                                        _____/s/_____
                                                              Ellen Lipton Hollander
                                                              United States District Judge